**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JERRY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 06104 |
| | ) | |
| UNIVERSITY OF ILLINOIS, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Jerry Brown, alleges that the University of Illinois violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") by discharging him from employment based on his age, national origin, race, and religion, and in retaliation for filing a number of federal lawsuits and charges with the Equal Employment Opportunity Commission ("EEOC"). Brown also claims that he was subject to the University's disparate pay system based on his race, religion, national origin, age, and ancestry/ethnicity. The University moves for summary judgment. For the following reasons, the motion is granted.

## PRELIMINARY ISSUES

As an initial matter, the Court must clarify upon what materials it relies in establishing the facts on which the defendant's summary judgment motion must be decided. This is necessary because during his initial deposition, Brown failed to answer many questions seeking to establish the factual basis for his claims. For example:

> Q: [Y]ou continue to raise complaints of salary inequity in the litigation pending before Judge Tharp, yes?
>
> A. If that is what I have in my litigation before Judge Tharp, then that is what I am alleging.

Q. Do you not know, Mr. Brown, what the allegations are that you are alleging before Judge Tharp?

A. I am not going to state exactly what I have put in writing because I am not going to try to recall everything that I have written down. . . .

* * * * *

Q. You have in your head information that supports -- that you believe supports your claims of discrimination against my client, correct?

A. I believe the information that will support my claim will be the documentation that I have and the deposition evidence from others. I do not --

Q: What documentation do you believe supports your claim against the University?

A. Are you expecting me to name every document? Because I cannot do that at this time.

Q. Mr. Brown, . . . -- yes, I am. I'm asking you to identify documents, evidence, facts, and information that you believe supports your claim against the [U]niversity. Are you able to do that today?

A. I am able to answer whatever questions you want me to answer, but if you are asking me to lay out a full case step by step, detail by detail, I am not prepared to do that today.

Brown Dep. 1 at 44:21–45:8; 131:10–132:7; *see also id.* at 99:11–102:9;

Defense counsel paused the deposition to call Magistrate Judge Rowland, to whom discovery supervision had been referred. Judge Rowland ordered Brown to answer the questions—"for you to say, [ ] I'm not prepared to answer that question today and you have to look through the 8,000 pages or the 800 pages of documents that have been produced in this litigation in order to get the answer, that is not an answer"—and explained that "[The University] is entitled, as the defendant, to understand the basis of your allegations, and [counsel is] entitled

to ask you that question and you are required to answer that question." Brown Dep. 1 at 140:7-12; 141:8-12; *see also id.* at 136:22–137:5 ("So if you five years—four years into a case . . . you are not prepared to tell the lawyer for the defendant what the basis of your case is, what's the basis of your allegations that the university discriminated against you, that is going to present a real problem for you.").

The parties ended Brown's first deposition, with the understanding that Brown's "homework" was to review the documentation and come to his next deposition prepared to explain the basis of his allegations. *See* Brown Dep. 1 at 157-59. He failed to do so, however, and during his second deposition, Brown engaged in the same evasive tactics:

> Q. [T]he information that you were provided by Dr. Miller, do you have any evidence to dispute the facts that he provided to you?
>
> A. I will again state, as I have stated before, I do not recall everything that Dr. Miller stated in his deposition testimony. Therefore, I cannot go back and state what is correct or what is not correct or what I believe is correct or not correct because I cannot recall everything that Dr. Miller stated.
>
> Q. And you understood that today you were supposed to be prepared to do that?
>
> A. I did not understand today that my job was to go and contradict Dr. Miller's testimony.
>
> Q. Well, I'm asking you today, what evidence do you have that would contradict Dr. Miller's testimony?
>
> A. I do not have Dr. Miller's testimony in front of me, and I would not care at this point to attempt to dispute Dr. Miller's testimony.

Brown Dep. 2 at 208:11–209:7. Brown acknowledged that he did not follow Magistrate Judge Rowland's order to come prepared to his second deposition:

Q: Did you review any of the deposition transcripts prior to your deposition today?

A. No, I did not.

Q. Did you review any documents prior to your deposition today?

A. No, I did not.

Q. You recall that when we met on June 24, 2014, that we spoke with the judge near the end of your deposition? Do you recall that? . . . And the judge admonished you that today was the day that during your deposition, that you were to be prepared to respond to all of the questions that we asked of you today?

A. I believe that is what the judge said or something to that effect.

Brown Dep. 2 at 181:1-16.

To support Brown's Statement of Facts and his Response to the University's Statement of Facts, Brown now submits his affidavit, which addresses a range of information, including many of the subjects Brown failed (or refused) to address at his depositions. *See* B Ex. 30. The Seventh Circuit "ha[s] been highly critical of efforts to patch up a party's deposition with his own subsequent affidavit." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995). "Where deposition [testimony] and an affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Id*. at 67-68; *see also Chaparro v. City of Chicago*, 47 F. Supp. 3d 767, 771 (N.D. Ill. 2014), *appeal dismissed* (Mar. 25, 2015) ("The purpose of discovery is to narrow the issues and give the opponent an opportunity 'to secure information about the existence of evidence that may be used at trial . . .'").

Brown's obstructionist conduct with respect to his depositions is unacceptable. All litigants have a duty to cooperate in discovery (*see* Fed. R. Civ. P. 37) and the record makes

plain that Brown intentionally failed to do so. While Brown cannot necessarily have been expected to identify from memory, in response to open-ended questions, every fact and document on which his claims were based, he was required to make a good faith effort to explain the factual basis for his claims. Brown refused to do so and his tactics cannot be excused as the product of poor memory or a pro se litigant's confusion or lack of knowledge about the rules; Brown was specifically instructed by the Magistrate Judge to come prepared with factual evidence and was given additional time to review discovery in order to do so. Nonetheless, Brown disregarded Magistrate Judge Rowland's order and failed to answer the University's legitimate questions. Having obstructed the University's efforts to discern the evidence supporting his claims, Brown cannot now unveil that evidence in an affidavit tendered in an effort to defeat a summary judgment motion. Because Brown did not provide the University with the opportunity to inquire into the facts and documentation upon which he relies to support his claims, his affidavit and his Statements of Facts and Responses to Statement of Facts that rely on the affidavit will be disregarded.[1] Fed. R. Evid. 37(a)(4) ("an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond").

Moreover, of the statements in Brown's affidavit not related to questions posed to him in his depositions, a number are not based on his personal knowledge, are hearsay, or both. In the absence of other record evidence by which the information set forth in those statements could be admitted, the Court must disregard those statements, as well.[2] *See* Fed. R. Civ. P. 56(c)(4) ("An

---

[1] The statements in Brown's affidavit that the Court must disregard due to his failure to respond in his depositions are ¶¶ 26, 31-36, 38-39, 44. *See* B Ex. 30.

[2] Some of the statements in Brown's affidavit relate to matters, such as the evaluations of other employees, as to which there is some otherwise admissible evidence in the record; that does not make Brown's affidavit statements themselves admissible, however. The statements in Brown's affidavit that are not based on Brown's personal knowledge, or are hearsay, or are simply argument are ¶¶ 6, 8, 14-16, 18-19, 22-23, 25, 27, 29. B Ex. 30.

affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."); *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("Although 'personal knowledge' may include inferences and opinions, those inferences must be substantiated by specific facts."). The factual background is accordingly taken from the parties' Local Rule 56.1 Statements to the extent that they are material, properly supported, and do not violate the Local Rules or the Federal Rules of Evidence.[3]

Additionally, Brown filed a motion for leave to file a sur-reply to respond to the additional declaration of Katherine Day. Dkt. 294. Because the Court does not rely on Day's June 23, 2015 declaration in granting the University's motion for summary judgment, Brown's motion is denied.

## BACKGROUND[4]

### I.     Brown's Work History

In November 1994, Brown began working for the Waste Management Resource Center ("WMRC") (now known as the Illinois Sustainable Technology Center, or "ISTC"), one of the four scientific "surveys" within the Illinois Department of Natural Resources ("IDNR"). USOF ¶ 3. In July 2008, the surveys were incorporated into the University of Illinois ("the University")

---

[3] Brown also asserted a number of additional facts in his Responses to the University's Statement of Facts, in violation of Local Rule 56.1. *See Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008) (Rule 56.1(b)(3) response not the proper place to assert additional facts). The court will consider these facts because, even doing so, Brown still failed to establish disputed material facts preventing summary judgment.

[4] Citations to the record are abbreviated as follows: University's Statement of Material Facts (Dkt. 261) ("USOF"); Brown's Response to the University's Statement of Material Facts (Dkt. 277) ("B Resp."); Brown's Statement of Additional Material Facts (Dkt. 278) ("BSOF"); and the University's Response to Brown's Statement of Additional Facts (Dkt. 293) (U Resp.).

as part of a newly created Institute for Natural Sciences and Sustainability ("Institute"). The mission of the surveys is to provide objective, integrated scientific research and service, in cooperation with other academic and research units of the University and elsewhere, that allow citizens and decision-makers to make choices that ensure sustainable economic development, enduring environmental quality, and cultural resource preservation for the people, businesses, and governments of Illinois. USOF ¶ 5. The WMRC, specifically, was formed to provide technical assistance to industries and businesses and to conduct research for the purpose of reducing or eliminating hazardous waste generation. USOF ¶ 6. WMRC managed a pollution prevention ("P2") program; during the time period relevant to this litigation, the P2 program included the following staff members: Ken Barnes, Joe Pickowitz, Dan Marsch, Mike Springman, Deb Jacobson, Malcolm Boyle, Riyaz Shipchandler, and Brown. USOF ¶ 12.

Brown was a manufacturing process engineer with the P2 program. USOF ¶ 7. Brown holds a bachelor's degree in chemical engineering and an MBA and is a "certified electroplater-finisher"; he holds no other professional certifications. USOF ¶ 9. Members of the P2 Program were responsible primarily for assisting companies in reducing their waste, minimizing their environmental footprint, conserving water, and conserving electricity. USOF ¶ 8. WMRC has an academic research laboratory and a P2 pilot laboratory in Champaign, Illinois, and a field office in Oak Brook, Illinois, which was staffed during the relevant period by Brown and three other P2 engineers.

Beginning in 2006, Brown's immediate supervisor was Deb Jacobson, who managed the P2 staff working out of the Oak Brook office—Boyle, Shipchandler, and Brown. USOF ¶¶ 11, 13. Jacobson reported to Dr. Timothy Lindsey, the manager of the P2 Program; Lindsey reported to Dr. George Vander Velde, the Director of the WMRC. *Id*. Dr. Gary Miller was the Assistant

Director of the WMRC. *Id.* Boyle had previously been a manager (and Brown's manager) for WMRC; he holds a master's degree in environmental engineering, dual bachelor's degrees in chemical engineering and chemistry, and was responsible for managing the ADOPT2 program, a three-state initiative for which Dr. Lindsey was the initial principal investigator and who, in turn, selected Boyle to manage the project. USOF ¶ 14. Shipchandler holds a master's degree in civil engineering, was the liaison with the Metropolitan Water Reclamation District, and is a "certified energy manager." USOF ¶ 15. Brown never held a managerial position with WMRC. USOF ¶ 14.

Brown had acrimonious relationships with a number of his supervisors, including Boyle, Lindsey, and Jacobson. Throughout Brown's employment, Lindsey managed the P2 Program. USOF ¶ 12. In a prior lawsuit, Lindsey admitted that he believed Brown was dishonest and untruthful, BSOF ¶ 1, a belief Brown attributes to racism.

As to Boyle, Brown presents a 2006 affidavit of a former WMRC employee, Christine Hayes.[5] B Ex. 5. Hayes worked for WMRC from 1994 to 2001 (and thus left WMRC about

_____

[5] Consideration of Hayes' "affidavit" presents myriad issues. Strictly speaking, Hayes' statement is a letter, not an "affidavit"—it is not sworn and otherwise contains no affirmations as to its truth—but putting that technicality aside, some of the statement is based on hearsay (*e.g.* "for many months, I heard about and sometimes witnessed the environment at the Oakbrook office decline in regards to moral [sic] and relationships"). To that extent, Hayes' statements are inadmissible and cannot be considered on summary judgment. *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003). The University's contention that "much" of Hayes' statement is inadmissible hearsay, however, is incorrect. Hayes' observations of interaction between Boyle and Brown, for example, are hearsay only because presented by affidavit, but that is an acceptable means of proffering the availability of evidence for trial in opposition to a motion for summary judgment. Hayes' written statement could not itself be offered as evidence at trial, but her testimony at trial about her observations of Boyle's interactions with Brown would, of course, not be hearsay. More pertinent is the question of relevance. Hayes' observations predate Brown's discharge by some seven years and involved a relationship with a supervisor who was not involved in the discharge decision. Brown relies on the Hayes' letter to support his claim that his low evaluations over the years were the result of discriminatory bias, but the letter in no way supports a claim that Boyle downgraded Brown's evaluations based on

8

seven years before Brown was discharged) and, like Brown, reported to Boyle for a period of time, though she did not work out of the Oakbrook office. *Id*. Hayes's affidavit discusses her observations of the relationship between Boyle and Brown and states that, once, after a conference call she participated in with Brown and Boyle, Hayes called Boyle and told him that she "thought he was being awfully hard on Mr. Brown" and notes that "this was not the first time Mr. Boyle had shown dissatisfaction with Mr. Brown's work performance. Often, [Hayes] believed this dissatisfaction was unwarranted." *Id*. Hayes does not attribute Boyle's dissatisfaction to any discriminatory bias, however, but rather to the fact that Boyle and Brown "had very different work styles," one (Brown) "slow and methodical" where the other (Boyle) "was quick and liked to move on." *Id*. Hayes also opines on Brown's work ethic, that Brown is "well educated, considerate, inquisitive (but conservative) and methodical" but also notes that "his projects often took a long time to complete. He became very focused and dedicated to his projects, which again, sometimes became a time drain." *Id*. Shortly after Hayes left WMRC in 2001, Boyle was removed as Chicago area office manager (the record does not expressly reflect whether his removal was due to his relationship with Brown; Lindsey testified only that he changed Boyle's duties "to better suit his talents"); Lindsey did not reconsider his evaluation of Brown in the wake of Boyle's removal. BSOF ¶ 14; U Resp. ¶ 7.

Jacobson became Brown's manager in 2006, and Lindsey sat in on Jacobson's initial performance evaluation of Brown in 2006; Lindsey did not sit in on Jacobson's meetings with any of the other staff members. BSOF ¶ 23. In 2007, Vander Velde sat in on Brown's review

---

racial bias. To the contrary, and as discussed in the text, Hayes attributed the friction between Boyle and Brown to their differing work styles. Ultimately, then, to the extent that Hayes' letter has any relevance to Brown's 2008 discharge, it undercuts Brown's claims that his low evaluations were the product of discrimination based on Brown's race and therefore supports the University's summary judgment motion.

meeting with Jacobson but not on her performance evaluation meetings with any of her other staff members. BSOF ¶ 23. Jacobson subjected Brown to additional deadlines, whereas other staff she supervised had few or no deadlines. BSOF ¶ 26. Jacobson testified that she imposed additional deadlines for Brown because of problems she was having with the "timeliness of [Brown's] work being completed," and that "[o]ther employees did not necessarily have specific deadlines assigned because the time management issues just were not there." U Resp. ¶ 26.

Brown's performance reviews were consistently lower than others in the P2 Program (undeservedly so, he maintains). USOF ¶ 16. Brown's performance review scores were as follows: 2.42 (out of 5) in 2007 (given by manager Jacobson); 2.46 in 2006 (by Lindsey); 2.93 in 2005 (by Ronda); 3.06 in 2004 (by Ronda); 3.06 in 2003 (by Ronda); and 2.93 in 2002 (by Ronda). *See* U Ex. 1. Aside from 2005, when one employee had a lower score (a Caucasian male who was placed on extended probation then terminated), Brown had the lowest score every year. *Id*. Brown brought up a number of his concerns with his 2007 performance review to Jacobson, who referred the matter to Vander Velde. B Ex. 1 at 13-18; Ex. 2. Vander Velde responded that he "believe[d] that the evaluation is a fair evaluation of your performance over the evaluation period," and that "You have been rated on your performance and your performance alone." B Ex. 2 at 2.

## II.    Brown's Termination

In mid-February, 2008, then-governor Blagojevich presented, in his "State of the State address," a proposal for the University to take over the IDNR surveys, including WMRC. USOF ¶ 17. As part of the transition to the University, the Board of Natural Resources and Conservation ("BNRC"), at the direction of the University, charged the surveys with removing

16% from their budgets for Fiscal Year 2009.[6] The surveys, including WMRC, were given approximately two weeks to fashion fiscal year 2009 budgets reflecting these cuts. Brown does not recall when he learned that WMRC and the other surveys would be transitioning to the University but understood that as a result of that transition some positions might be eliminated, around the start of the new fiscal year—fiscal year 2009—on July 1, 2008. USOF ¶ 19.

To reduce the budget, Vander Velde and Miller looked initially at, and made, operating cost reductions. USOF ¶ 21. The WMRC had already "suffered major cuts to the operating costs," however, and several of its employees, who possessed "key competencies" needed to keep the lab in Champaign running, were not among the group of employees who were at risk because of the need for further budget cuts. USOF ¶ 22. Director Vander Velde determined that these individuals included Dr. Kishore Rajagopalan (who operated the research lab) and Dr. Lindsey (who was then managing the P2 Program). USOF ¶ 23.

Vander Velde (who is Caucasian) and Miller (who is also Caucasian) identified the Assistant Director's (Miller's) position for elimination. USOF ¶ 25. Dr. Miller was not personally terminated, however, because Dr. Vander Velde retired in April 2008, and Miller became the Acting Director; Miller's former position of Assistant Director was then eliminated. USOF ¶ 26. Vander Velde and Miller also looked at operational positions to eliminate and

---

[6] The University asserts that the required budget cut was 10-23%, but the evidence it cites does not support that claim. USOF ¶ 18. The same holds true for Brown's contention the required budget cut was 13%. B Resp. ¶ 18. Both parties rely on, but misread, a memorandum from the Vice Chairman of the Board of Natural Resources, C.F. Zukowski, to the Chiefs of the surveys. U Ex. 2. The Zukowski memo indicates that the required reduction was 16%, consisting of a 10% general reduction, a 3% reduction to establish the office of the Institute, and a 3% cash recession reserve. *Id*. The memo, which was undated, was issued sometime between the Board's February 28 meeting (referred to in the memo) and March 16, the deadline for the submission of the budgets. Ultimately, it appears that WMRC's fiscal 2009 budget included a 15% overall reduction, as the reduction for creation of the Institute was reduced from 3% to 2%. *See* B Ex. 11 at 1.

identified the systems administrator (or data base management) position (held by a Caucasian male) and the facilities manager position (held by a Caucasian male) for elimination. USOF ¶ 27. Additionally, they eliminated the human resources assistant (a Caucasian female). USOF ¶ 28.

In considering the P2 positions, Vander Velde and Miller determined that they would have to "cut into muscle" because there was "no fat left to cut anywhere." USOF ¶ 29. Miller testified that he and Vander Velde examined the roles of the P2 staff and had to determine how best to meet client needs, considering that the staff were split between offices in Champaign and Oak Brook and that the staff had different responsibilities and expectations. USOF ¶ 31. In view of the cuts in state funding, Vander Velde emphasized retaining P2 staff who had the ability to obtain, or bring in, funded projects. USOF ¶ 32. Of the individuals who worked in the Oak Brook office, Brown had the lowest level of funded projects for fiscal year 2007 and fiscal year 2008, according to the chart compiled by the WMRC's grants and contracts coordinator.[7] USOF ¶ 33; U Ex. 4.

Furthermore, Miller had concerns regarding Brown's ability to bring in revenue and write proposals to funding agencies in order to do more "academic type research"; Brown had not been

---

[7] Brown now disputes the accuracy of the chart showing that he had the lowest level of funded projects, B Resp. ¶ 33, but when presented with this chart in his deposition, he responded that he did not have any information or evidence to dispute its accuracy. Brown Dep. 2 at 178:21–179:7; 311:2–312:10. Because Brown's subsequent dispute with the chart is based on information that was available to him at the time of his deposition—namely his 2007 performance review, his 2007-2008 list of personal accomplishments, and Lindsey's and Miller's depositions—this newly raised disagreement must be disregarded. *See Russell*, 51 F.3d at 67; Fed. R. Civ. P. 37(a)(4). Moreover, Brown's citations do not explain and support his new assertion that he, in fact, had the highest level of funded projects for the Chicago office for both fiscal years 2007 and 2008. B Resp. ¶ 33. Furthermore, as explained *infra* at 26, the relevance of this chart lies not in its truth but in the effect it had on Vander Velde's decision of which P2 employee to terminate. *See Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015) ("The question is not whether the employer's stated reason [for taking an adverse employment action] was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge."). Brown provides no basis to support his assertion that Vander Velde or others responsible for his termination knew that the chart was inaccurate.

bringing in those types of grants, so Miller did not have "a lot of confidence that [Brown] could in the future." USOF ¶ 35. Miller also thought Brown dedicated his time to the wrong type of projects and should have devoted his time to "innovative technologies" that related to pollution prevention or waste reduction. *Id.* Vander Velde believed that the range of work that Brown was performing was smaller than others in his peer group: for example, other P2s worked on a "variety of technologies," with different firms and industries, whereas Brown focused on a particular set of projects, primarily in the plating industry, which limited Brown's value to the WMRC. USOF ¶ 36. Conversely, Boyle was rated as the "highest performing overall" in the P2 Program[8] and was involved in "a lot of innovative projects," and Shipchandler had excellent results working with a number of different firms and institutions. USOF ¶¶ 37-38. Moreover, both Miller and Lindsey said that Brown had poor writing skills in comparison to Shipchandler (although Shipchandler's 2008 affidavit from a prior lawsuit states that Brown helped Shipchandler improve his writing skills and was a mentor to Shipchandler). BSOF ¶ 38.

Vander Velde testified that he selected Brown's position for termination because Brown was not performing at the same level as other P2 staff and because he was not bringing in a comparable amount of outside, funded work. USOF ¶ 34; Vander Velde Dep. 1 at 16:20–17:13. The FY '09 "preferred budget scenario," dated March 17, 2008, lists Brown's position as "lay off 6/30/08." B Ex. 11 at 2. The chart lists an additional two positions as layoffs, lists two vacated positions that would not be replaced, changes one salaried position to a contract position, and notes that two positions would be filled via contract only if funding was available. *Id.*

Both Vander Velde and Miller testified that Brown's race, religion, ethnicity, national origin, age, and prior complaints played no role in the decision to eliminate his position. USOF

---

[8] Brown disputes this fact for the same reasons noted in footnote 7.

¶¶ 42-43. Brown acknowledged that, as director, Vander Velde would have the responsibility of making the final recommendation to the BNRC that he had chosen Brown's position for elimination. USOF ¶ 29. Brown testified that he did not have any facts to "challenge the answers that [ ] were provided by Dr. Miller or by Dr. Vander Velde relative to the criteria that they used to make the decision [ ] as to which position was going to be eliminated within the P2 group." USOF ¶ 65; Brown Dep. 2 at 297:18–298: 3 ("At this point in time, I do not have anything that I would state to challenge their deposition nor would I at this point in time seek to challenge anything in their deposition."). Brown also admitted in his deposition that he has no evidence that his performance evaluations were discriminatorily downgraded because of his age, religion, or ethnicity (as distinguished from race). USOF ¶¶ 71-73.

When asked to identify another P2 position that should have been eliminated rather than his, Brown testified that the WMRC did not need to eliminate any P2 position in order to meet the mandated budget cuts. USOF ¶ 45; B Resp. ¶ 29. When asked if Boyle's or Shipchandler's position should have been eliminated instead of his, Brown testified only that "it depend[ed] on what WMRC was seeking to achieve." USOF ¶ 46.

On July 1, 2008, the University of Illinois assumed control of all four of the scientific surveys. USOF ¶ 20. Brown learned on July 6, 2008 that his position had been selected for elimination, which would take effect on September 30, 2008. USOF ¶ 41; B Resp. ¶ 41. Also on July 1, 2008, the University increased the salaries of nearly all of the P2 employees, including Brown, by 3%.[9] USOF ¶ 51. Boyle was the only P2 employee who received a different salary

---

[9] Although the University does not directly explain why it raised salaries in the face of significant budget cuts, Vander Velde testified to the importance of "ameliorating the merit salary inequities" between WMRC employees and their counterparts at the University upon WMRC's incorporation into the University. *See* Vander Velde Dep. 1 at 36:13–37:7.

increase of only 1%.[10] USOF ¶ 52. The parties provided a chart showing P2 staff members, their education, experience, salary as of 2/9/2008, and salary as of 7/1/2008:

| P2 Staff Member | Degree(s) | Years Exp Prior to ISTC | Years at ISTC (6/2008) | 2/9/2008 Salary | 7/1/2008 Salary | Race[11] |
|---|---|---|---|---|---|---|
| Barnes, Kenneth | BS-Gen Educ | 13 (+15 military) | 14.5 | 56,580 | 58,277 | Caucasian |
| Boyle, Malcolm | MS-Env Eng; BS-Chem Eng; BS-Chem | 22 | 13.5 | 88,275 | 89,158 | Caucasian |
| Brown, Jerry | BS-Chem Eng; MBA | 17 | 13.5 | 62,993 | 64,883 | African-American |
| Jacobson, Debra | MS (in progress); BS-Env Sci | 3 | 12.5 | 69,112 | 71,185 | Caucasian |
| Marsch, Danny | BS-Bus Mgmt | 11 | 4 | 55,310 | 56,969 | Caucasian |
| Pickowitz, Joseph | BS-Business | 7 | 15.5 | 56,436 | 58,129 | Caucasian |
| Shipchandler, Riyaz | MS-Civil Eng BS-Chem Eng | 3 | 6.5 | 64,009 | 65,929 | Indian |
| Springman, Michael | BS-Env Bio | 16 | 11 | 51,493 | 53,038 | Caucasian |

B Ex. 13; U Ex. 9.

### III. Brown's Prior Discrimination and Retaliation Claims

Prior to this litigation, Brown had filed a number of charges and lawsuits against WMRC (or its predecessor-in-name, the IDNR); (1) On January 17, 2002, Brown sued for failure to promote based on race and in retaliation for prior complaints of unequal treatment (*Brown I*);[12] (2) On April 25, 2005, Brown sued for discrimination on the basis of race/national origin because he had "only received salary increases that have approximately kept pace with inflation"

[10] There is no information in the record as to why Boyle's salary increase was lower than the other P2 program employees.

[11] The Court added the "Race" column to aid in comparison. *See* Vander Velde Dep. 1 at 91-92; Resp. at 9.

[12] On January 25, 2006, Judge Nordberg granted summary judgment to WMRC, which the Seventh Circuit affirmed on September 18, 2007. *See* No. 02-cv-00398, Dkt. 49; *Brown v. Ill. Dep't. of Natural Res.*, 499 F.3d 675 (7th Cir. 2007).

and for retaliation for having raised complaints regarding that perceived inequity (*Brown II*);[13] (3) On May 18, 2007, Brown sued for failure to promote on the basis of race and national origin and for retaliation for having filed prior litigation (*Brown III*);[14] (4) On May 3, 2007, Brown filed a charge with the Illinois Human Rights Commission (ALS Number 07-322, Charge Number 2006 CF 2612), alleging disparate pay on the basis of race and retaliation for having filed prior grievances (*Brown IV*);[15] (5) On December 17, 2007, Brown sued for discrimination on the basis of race, ancestry, religion, age, and national origin, alleging that (i) his salary was significantly below the salaries of "similarly educated and experienced engineers," (ii) that his supervisors repeatedly downgraded his performance evaluations, and (iii) that he was retaliated against for prior complaints of similar conduct (*Brown V*).[16] USOF ¶¶ 56-60. In granting summary judgment in *Brown V*, Judge Zagel ruled that the relevant dates for employment actions at issue in that case spanned from September 12, 2006 through February 9, 2008. *See Brown v. Illinois Dep't of Natural Res.*, No. 07 C 7080, 2011 WL 5403466, at *1 (N.D. Ill. Nov. 8, 2011), *aff'd*, 519 F. App'x 930 (7th Cir. 2013).

Brown filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") on April 21, 2009, claiming that he was paid unequal wages and that he had been

---

[13] On February 9, 2009, Judge Shadur granted summary judgment to the IDNR, and Brown did not appeal that decision. *See* No. 05-cv-02460, Dkt. 133.

[14] On May 15, 2009, Judge Holderman granted summary judgment to the IDNR, and Brown did not appeal that decision. *See* No. 07-cv-02808, Dkt. 45.

[15] On June 18, 2014, the Illinois Human Rights Commission issued a summary decision in favor of WMRC. *See* U Ex. 12.

[16] On November 8, 2011, Judge Zagel granted summary judgment to the IDNR. *See Brown v. Illinois Dep't of Natural Res.*, No. 07 C 7080, 2011 WL 5403466, at *1 (N.D. Ill. Nov. 8, 2011). On March 19, 2013, the Seventh Circuit affirmed Judge Zagel's grant of summary judgment. *Brown v. Illinois Dep't of Natural Res.*, 519 F. App'x 930, 931 (7th Cir. 2013). Brown appealed the Seventh Circuit's ruling to the United States Supreme Court, which denied his petition for review. *Brown v. Illinois Dep't of Natural Res.*, 134 S. Ct. 829 (2013).

discriminated against because of his "race, Black, religion, Christian, [age, 55 (d.o.b. 2/16/1953)], and national origin, American . . . [and] retaliated against for engaging in protected activity." Compl. Ex. 1, Dkt. 1. The EEOC issued a notice of right-to-sue on June 22, 2010, and Brown filed the instant lawsuit on September 23, 2010. USOF ¶ 54. Judge Gettleman denied both of the University's motions to dismiss.[17] Dkts. 42, 53. The University now moves for summary judgement. Dkt. 259.

## DISCUSSION

Brown's Title VII claims are based on his 2009 charge of discrimination filed with IDHR, in which he alleges retaliatory discharge, discrimination based on race, religion, age, and national origin, and disparate pay. Brown makes no arguments, however, in support of his claims of discrimination based on religion, age, or national origin/ethnicity; those claims are therefore waived. *See Bonte v. U.S. Bank, N.A.,* 624 F.3d 461, 466 (7th Cir. 2010). Brown argues only racial discrimination in support of his disparate treatment claims. Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding the University's motion for summary judgment, the Court construes all properly disputed facts and inferences in favor of the nonmoving party. *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). If the moving party has demonstrated the absence of a disputed material fact, then the burden shifts to the nonmoving party to "provide evidence of specific facts creating a genuine dispute." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). Based on the undisputed facts in the record, Brown has not met his burden to provide evidence of specific facts from which a jury could reasonably

---

[17] This case was transferred to this Court from Judge Gettleman on June 1, 2012. Dkt. 59.

find that the University terminated him because of his race or his prior complaints of discrimination and retaliation. Summary judgment is therefore granted to the University.

## I.    Employment Evaluations

Brown contends that his performance evaluations were repeatedly downgraded based on his race. Under Title VII, a claimant must file a charge with the EEOC within 300 days of the allegedly discriminatory action serving as the basis of the charge. 42 U.S.C. §2000e-5(e); *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 825 (7th Cir. 2015). Brown filed his charge of discrimination underlying this suit on April 21, 2009. Thus, his claims in this litigation only encompass actions that occurred within the prior 300 days—*i.e.* after June 25, 2008.[18] Brown argues that his "claim in this litigation is that his performance evaluation scores were lower due to discrimination." B Resp. ¶ 40; *see also* Compl. at 3 ("Defendant . . . repeatedly downgraded Plaintiff's performance evaluations . . . which constitutes willful discrimination."). Brown received his 2007 employment evaluation (the last evaluation he received) on July 31, 2007, however, long before the 300-day window encompassed in his April 2009 charge. Thus, Brown is time-barred from seeking relief for the allegedly discriminatory 2007 performance evaluation. Moreover, Brown had the opportunity to litigate any and all performance evaluations prior to 2007 in his previous lawsuits. *See, e.g.*, *Brown v. Illinois Dep't of Natural Res.*, No. 07 C 7080, 2011 WL 5403466, at *1 (N.D. Ill. Nov. 8, 2011) (considering Brown's claim that his 2006 performance review was discriminatorily downgraded). Any claims pertaining to those earlier evaluations are not only time-barred but also barred by res judicata. *See Palka v. City of*

---

[18] The Court's calculation (June 25, 2008) differs from the University's calculation (June 26, 2008) by one day; this difference is not material for the purposes of summary judgment.

*Chicago*, 662 F.3d 428, 437 (7th Cir. 2011) ("[R]es judicata prevents the relitigation of claims already litigated as well as those that could have been litigated but were not.").[19]

## II.     Retaliatory Discharge

Brown claims that his discharge was in retaliation for the various charges of discrimination and lawsuits that he had filed against his employer. Title VII prohibits retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3. To establish a retaliation claim, a plaintiff may use either the indirect or direct method of proof. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008). Brown invokes only the direct method. *See* Resp. at 6 (reciting elements of direct method only, notwithstanding reference to establishing a "prima facie" claim).

To establish retaliation under the direct method of proof, a plaintiff must provide evidence that (1) "he engaged in a statutorily protected activity," (2) "that the defendants subjected him to an adverse employment action," and (3) "that a causal connection exists between the two events." *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006). To establish a causal link, the plaintiff must show that his protected activity "was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013). That means that Brown must adduce evidence sufficient to

---

[19] Moreover, as the Seventh Circuit observed in one of Brown's prior appeals, "a performance evaluation that contains suggestions for improvement, standing alone, is not itself materially adverse." *Brown V*, 519 F. App'x at 933. Thus, Brown's claims of discrimination based on his receipt of an adverse employment evaluation would also fail for lack of an adverse employment action. *See Mintz v. Caterpillar Inc.*, 788 F.3d 673, 680 (7th Cir. 2015) (proof of an adverse employment action is required to prove a Title VII discrimination claim).

convince a reasonable trier of fact, by a preponderance of the evidence, that he would not have been terminated had he not filed charges and lawsuits against WMRC. *Id.* at 2525.

Brown satisfies the first two requirements of the direct method: (1) Brown engaged in protected activities when he filed a lawsuit against his employer on December 17, 2007 (*Brown V*) and a charge with the EEOC on February 29, 2008; and (2) Brown learned on July 6, 2008 that his position had been selected for elimination, effective September 30, 2008—the adverse employment action. It is the third prong—the causal connection between the lawsuits and his termination—that Brown fails to satisfy.

A plaintiff may establish a causal link "via direct evidence, which would entail something akin to an admission by the employer ('I'm firing you because you had the nerve to accuse me of [race] discrimination!')." *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388 (7th Cir. 2012). Direct evidence is "rare indeed," and Brown has provided no such direct evidence here. *Id.* (*quoting Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1114 (7th Cir. 2009)). Causation also may be established via circumstantial evidence, such as (1) "suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of causation might be drawn, (2) evidence showing that the employer systematically treated other, similarly situated . . . employees better, or (3) evidence that . . . the employer's justification [for the adverse action was] pretextual." *Milligan*, 686 F.3d at 388-89 (*quoting Silverman v. Bd. of Educ. of City of Chicago,* 637 F.3d 729, 734 (7th Cir. 2011)). These evidentiary categories are not exclusive; the point is that there must be sufficient evidence from which it would be reasonable to infer that the adverse employment action would not have been taken if Brown had not engaged in the protected action.

To establish causation, Brown relies entirely on the timing of his February 2008 EEOC charge and the decision in March 2008 to terminate his position. *See* Resp. at 7 ("As for the third prong, the timing in this case is suspicious to say the least."). Brown argues that his termination was decided less than a month after he filed his February EEOC charge, by at least March 17, 2008 (the date of the draft budget reduction "preferred scenario"). As the Seventh Circuit has explained repeatedly, however, "[i]t is well established that 'mere temporal proximity between [the statutorily protected activity] and the action alleged to have been taken in retaliation for that [activity] will rarely be sufficient in and of itself to create a triable issue.'" *Harper v. C.R. England, Inc.*, 687 F.3d 297, 308 (7th Cir. 2012) (*quoting Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002)) (brackets in original); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("Speculation based on suspicious timing alone[ ] does not support a reasonable inference of retaliation."). It is easy to understand why temporal proximity alone is insufficient to establish retaliatory intent; if timing alone sufficed, employers would be unable to take even well-deserved adverse actions against employees in the wake of the filing of an EEOC charge or similar complaint.

Here, the timing between the EEOC charge and the date that Brown's position was proposed for termination is a little over two weeks. Without any context, one might be inclined to agree with Brown that the timing of his discharge seems suspicious. But context matters; what Brown fails to acknowledge is the contemporaneous announcement in mid-February that, as part of the transition to the University, the surveys had to reduce their fiscal year 2009 budgets substantially and had to do so on an expedited timeline. The existence of an independent reason to explain the timing of Brown's discharge undercuts the inference of retaliatory intent that

Brown urges based on the temporal proximity between Brown's February EEOC charge and the March budget scenario eliminating his position.[20]

Brown's argument is weakened further by the fact that his position was not the only position eliminated as part of the budget cuts; the "preferred [budget] scenario" listed three positions (including Brown's) as layoffs, listed two vacated positions that would not be replaced, changed one salaried position to a contract position, and noted that two positions would only be filled as contract positions if funding was available. B Ex. 11 at 2. That many positions were eliminated, not just Brown's, supports an inference that Brown "was the unfortunate victim of a reduced workforce" upon WMRC's incorporation into the University rather than a victim of discrimination. *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 884 (7th Cir. 2014).

Brown lacks any evidence that would reveal the University's proffered reasons for his termination to have been pretextual.[21] The University offers the mandatory budget cuts and Brown's comparably lower productivity and performance as the legitimate, non-retaliatory

---

[20] The number of lawsuits and EEOC/IDHR charges Brown had filed against the University prior to his 2008 EEOC charge also works against Brown's attempt to connect his termination to his most recent EEOC filing. WMRC did not terminate Brown after his first charge and federal lawsuit, or his second, or his third, or his fourth, so there is little reason to think that Brown's employer sought to punish him for airing complaints of discrimination or filing charges or lawsuits. One might be able to speculate that perhaps Brown exhausted the University's tolerance by filing another EEOC charge in 2008, but Brown offers no evidence in support of such a hypothesis; nothing in the record suggests that anyone at the University viewed Brown's 2008 EEOC charge to be the straw that broke the camel's back.

[21] "Pretext" is the plaintiff's burden to show when using the indirect method of proof after an employer offers a non-retaliatory or non-discriminatory reason for the adverse action. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008). It is, however, relevant to the question of causation when, as here, a plaintiff employs the direct method of proof. *See, e.g.*, *Tank v. T-Mobile USA, Inc.*, 758 F.3d 800, 808 n.3 (7th Cir. 2014) ("The evidence used to show pretext in the indirect method may also be used under the direct method."); *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776 (7th Cir. 2013) (noting that "evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination" is a type of circumstantial evidence under the direct method).

reasons for his termination. Indeed, Brown testified that he did not have any facts to "challenge the answers that [ ] were provided by Dr. Miller or by Dr. Vander Velde relative to the criteria that they used to make the decision [ ] as to which position was going to be eliminated within the P2 group." USOF ¶ 65; Brown Dep. 2 at 297:18–298: 3. In his opposition brief, however, Brown takes issue with the argument that his position was eliminated due to the need to cut the budget, noting that the "preferred [budget] scenario" allocated funds for two additional chemical engineers: "Vander Velde and Miller actually presented to BNRC a plan to eliminate Brown's chemical engineering position and hire two other chemical engineers. Brown's position did not have to be eliminated to satisfy the mandated budget cuts as Defendant has claimed." Resp. at 8.

In offering this untimely response (Brown failed to identify this fact during his deposition as support for his claim that his termination was discriminatory), Brown both misunderstands the University's argument and mischaracterizes the record. The University does not contend that there was no way to make the required budget cuts other than to eliminate Brown's position; the argument, rather, is that given Brown's low performance (relative to other P2 employees) and the need to reassess WMRC's program priorities in light of the transfer to the University and the budget reductions it entailed, Vander Velde and Miller concluded that the elimination of Brown's position was preferable to other available options. That management had other options, considered less desirable, that would have permitted them to retain Brown does not demonstrate that they were retaliating against Brown because of his prior discrimination complaints; it shows only that they did not value Brown's contributions sufficiently to keep him on the team.

Brown's argument also mischaracterizes the record. Although he had a degree in chemical engineering, Brown did not work for the University as a chemical engineer but rather as a manufacturing process engineer. Resp. at 1. The creation of new chemical engineer

positions, then, provides no basis to infer that Brown's termination was not related to the new budget; Brown did not do the work of a chemical engineer. Indeed, the creation of new chemical engineer positions at the expense of Brown's position was consistent with WMRC's new "emphasis on research" and reduced "focus on analytical service work," B Ex. 12 at 8, the type of work that Brown performed. *See* B Ex. 25 Jacobson Dep. at 35:18-23. ("Mr. Brown's skill sets remained narrowly focused on the metal finishing industry, . . . whereas, other employees were more broadly working with other industries and types of organizations."). Whether that change in emphasis was a good idea, or whether it required the hiring of additional chemical engineers, is not the issue. As the Seventh Circuit has repeatedly stated, "it is not our province to sit as a super-personnel department evaluating the wisdom of an employer's staffing decisions." *Ripberger*, 773 F.3d at 878.

Brown does not dispute that the evidence of record establishes that he had the lowest performance review scores and the lowest funding totals; instead, Brown attacks the validity of the numbers, arguing that his performance evaluations were the product of race discrimination and that Day intentionally miscalculated the funding data because she was "Lindsey's accomplice in discriminating against Brown."[22] Resp. at 9. As for his record of obtaining funding, Brown offers no evidence to support his conclusory allegation that WMRC "deliberately attributed Brown's projects" to other P2 staff "in order to make it appear that Brown was the lowest performing staff member; for the express purpose of eliminating Brown's

---

[22] As noted *supra*, Brown is time-barred from seeking relief based on his 2007 employment evaluation; he may, however, use that and other prior evaluations in attempting to show pretext for his timely claims. *See Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 787 (7th Cir. 2004) (*citing Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002)) ("[W]here [ ] the plaintiff timely alleged a discrete discriminatory act (*i.e.,* his termination based on his race and in retaliation for filing prior charges), acts outside of the statutory time frame may be used to support that claim.").

position." Indeed, during his deposition, he affirmed that he had no evidence to show that the funding records were inadequate. *See* Brown Dep. 2 at 178:21–179:7; 311:2–312:10. As the Seventh Circuit has reiterated, "our favor toward the nonmoving party on summary judgment does not extend to drawing inferences that are supported by only speculation or conjecture." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1108 (7th Cir. 2012) (internal quotations omitted).

As for his performance reviews, although Brown disputes that his low reviews were warranted, an employee's "own opinion about his work performance is irrelevant." *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 897 (7th Cir.) *cert. denied*, 135 S. Ct. 2861 (2015) (*citing Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) ("'An employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability.'")). Further, Brown's contention that "Lindsey's mission was to ensure that Brown's performance ratings were always the lowest," and that "Jacobson follow[ed] in Boyle's footsteps [by giving Brown low performance review scores] with Lindsey's guidance,"[23] Resp. at 3, is both unsupported and effectively rebutted by the fact that Brown received the lowest performance evaluations of P2 employees no matter who evaluated him.

---

[23] Brown argues that Jacobson's approach to his evaluations was "glaringly racist" because she "admitted she evaluated Brown on things other than his performance and she subjected him to different terms and conditions of employment." Resp. at 10. That sounds bad— but the argument reflects a gross distortion of the record and illustrates the dearth of evidence supporting Mr. Brown's claim of racial discrimination. What Jacobson "admitted" was that she imposed deadlines on Brown but not on other employees because, unlike the other employees she supervised, "Mr. Brown needed to have deadlines to perform his work in a timely manner. Where other employees needed much less supervision and oversight and did not require to have assigned deadlines to get things done in a timely manner." B Ex. 25 at 103:5-9. Nothing in the record suggests that Jacobson assigned deadlines to Brown because he is an African-American and doing so did not subject Brown to "different terms and conditions of employment." Brown, like other P2 employees, was required to deliver timely work product. Brown does not argue, and presents no evidence to show, that any deadlines imposed on him were inconsistent with the time frames in which other P2 employees were expected to complete their work.

Although Lindsey was responsible for one of Brown's performance reviews in 2006, the only manager with whom Brown did not have a difficult relationship—Ronda—was responsible for four years of Brown's low performance review scores. The low scores Brown received from Lindsey and Jacobson in the 2006 and 2007 reviews were not abnormalities; Brown already had the lowest reviews in the P2 program for three of the four preceding years (and the second lowest in the fourth year, only above an employee who was put on probation then terminated). That Brown's reviews for the four prior years were consistently the lowest (and were given by a manager Brown does not claim was biased or discriminatory)[24] undermines any basis to infer that Lindsey's 2006 and Jacobson's 2007 reviews were discriminatory.

Nor has Brown offered evidence that Lindsey was involved in the decision to terminate Brown's position; rather, Vander Velde, WMRC's Director, had the responsibility of making the final decision to eliminate Brown's position. Brown does not allege that Vander Velde had any discriminatory motivation, and whether the information Vender Velde and Miller relied upon in determining that Brown was the lowest performer was accurate is beside the point. In evaluating pretext, "[t]he question is not whether the employer's stated reason [for taking an adverse employment action] was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015). Here, Brown has adduced no evidence to suggest that Vander Velde and Miller did not believe the accuracy of the reviews or the funding chart. When Brown raised concerns about his performance review in 2007, Vander Velde responded that Brown had "been rated on [his] performance and [his] performance alone." B Ex. 2 at 2. Even if Brown had provided evidence that Lindsey's 2006 performance review was designed and intended to result in

---

[24] In fact, Brown states that Ronda tried to promote Brown at some point. Resp. at 9.

Brown's termination, that was only one of the six low-scoring reviews considered. And as noted *supra* at 25, there is no allegation of discriminatory motive in Ronda's four low-scoring reviews. The record reflects that Vander Velde and Miller looked at the performance review scores and the funding levels and chose the lowest scorer on both charts—Brown—for termination. *See Harper*, 687 F.3d at 309 (no circumstantial evidence of retaliation where manager other than plaintiff's direct supervisor, about whom plaintiff had complained, made the termination decision); *Ripberger*, 773 F.3d at 882 (insufficient evidence of retaliation where plaintiff failed to establish that alleged retaliator was involved in decision not to hire her for new position).

Recognizing that he has no evidence that Vander Velde based his decision to eliminate Brown's position on Brown's discrimination claims, Brown also argues that "Vander Velde and Miller acted as Lindsey's cat's paw" by overlooking "Lindsey's discriminatory bias against Brown in order to keep Lindsey happy." Resp. at 9-10 ("Vander Velde and Miller were just going along with the flawed written information and the racially motivated verbal information they received from Lindsey and Day.")[25] "[C]at's paw liability may be imposed on an employer where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012) (internal quotations omitted). This liability is only permissible when "the 'recommendations of [non-decision-makers] [ ] were *designed and intended* to produce the adverse action.'" *Id.* at 900 (*quoting Staub v. Proctor Hosp.*, 562 U.S. 411, 420 (2011)) (emphasis in original). Brown has not produced a shred of evidence that Lindsey's 2006 review was "designed and intended" to result in Brown's termination; to the contrary, as noted, Lindsey's evaluation was consistent with all of the other evaluations Brown

---

[25] Brown invokes the "cat's paw" theory in defending his retaliation claim, but refers to Lindsey's alleged racial bias rather than to any retaliatory intent.

received. Nor did Lindsey's evaluation result in Brown's termination; Brown continued to work at WMRC for two more years following his receipt of that evaluation.

Brown, in short, has failed to produce evidence permitting a reasonable inference that, but-for his December 2007 lawsuit or February 2008 EEOC charge, he would have kept his position. Thus, there is no triable issue regarding whether Brown's termination was in retaliation for his prior lawsuit and EEOC charge; summary judgment is granted to the University on the retaliation claim.

## III. Race Discrimination

Brown defends his race discrimination claim under the indirect method of proof. To establish a prima facie case of race discrimination under the indirect method, Brown must show that: (1) he was a member of a protected class (*i.e.* African-American); (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated similarly situated employees not in Brown's protected class more favorably. *See Mintz v. Caterpillar Inc.*, 788 F.3d 673, 680 (7th Cir. 2015). If Brown demonstrates a prima facie case, the burden shifts to the University to show a legitimate, non-discriminatory reason for the adverse employment action. *Id*. If the University does so, Brown must show that the University's reason is pretext. *Id*.

The University does not contest the first three prongs—that Brown is African-American, that he was meeting the University's legitimate expectations, and that his discharge qualifies as an adverse employment action. Rather, the University focuses on prong four, arguing that Brown has not identified any similarly situated individuals not in Brown's protected class that were treated more favorably.

A plaintiff may demonstrate that another employee is similarly situated to him by "'show[ing] that there is someone who is directly comparable to [him] in all material respects.'" *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002) (*quoting Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002)). Brown did not even name any similarly situated employees, let alone show that they were treated more favorably; instead, Brown argues that he "was the *only* manufacturing process engineer in the P2 program and the only one at WMRC," and that "Brown's position was the only position that was unique to WMRC that was eliminated." Resp. at 1, 11. Moreover, in his deposition, Brown conceded that "all of the job descriptions were separate from [his]" and that he was the "only field person" with the title of technology evaluation specialist. Brown Dep. 1 at 115:24–117:9. Brown's description of his position as "unique" is directly contrary to any argument that other employees were similarly situated to him.[26] Because Brown admits that there were no similarly situated employees, he cannot establish a prima facie case of race discrimination. *See Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003) (plaintiff "cannot meet her burden by pointing to an absence of *any* similarly situated" employees).

Even if Brown were able to prove a prima facie case, he has failed, for the reasons explained above in connection with his retaliation claim, to prove that the University's proffered legitimate, non-discriminatory reason for terminating him was a pretext. The University maintains that it terminated him because he was the lowest reviewed P2 member and because he brought in the lowest amount of outside funding. Brown has failed to show those reasons to be

---

[26] In *Brown V*, Judge Zagel noted that Boyle and Shipchandler—the two other P2 engineers who worked in the Oak Brook office—were not similarly situated to Brown. No. 07 C 07080, Dkt. 63. Judge Shader also noted that Brown and Shipchandler were not similarly situated in *Brown II. Brown v. Illinois Dep't of Natural Res.*, No. 05 C 2460, 2009 WL 311067, at *5 (N.D. Ill. Feb. 9, 2009).

pretextual. Summary judgment is therefore granted to the University on Brown's race discrimination claim.

## IV.    **Disparate Pay**

Brown asserts that "each paycheck that [he] received in 2007 and 2008 was discriminatory because all similarly-educated, similarly-experienced, similarly-located Caucasian employees were paid at a much higher rate of pay." Resp. at 15. As explained *supra*, however, Brown's claims in this litigation only encompass actions that occurred within the 300 days prior to the filing of his IDHR charge—*i.e.* after June 25, 2008. Because of the 300-day window, Brown's disparate pay claim only applies to his compensation after June 25, 2008.

Under Title VII, "an unlawful employment practice occurs, with respect to discrimination in compensation . . . when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid . . . ." 42 U.S.C. § 2000e-5(e)(3)(A); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002) ("[E]ach week's paycheck that deliver[ed] less to a black than to a similarly situated white is a wrong actionable under Title VII.").

Brown relies on the indirect method of proof to attempt to establish a prima facie case of pay discrimination: "Brown must simply establish that (1) he is black, (2) he was performing up to Defendant's legitimate job expectations, (3) he suffered an adverse employment action, and (4) similarly situated non-black employees were treated more favorably." Resp. at 11 (*citing Hildebrandt v. Illinois Dep't of Natural Res.*, 347 F.3d 1014, 1030 (7th Cir. 2003)).

Like almost all other P2 employees, Brown received a 3% salary increase as of July 1, 2008 (Boyle, who received a 1% salary increase, was the only P2 employee who did not receive a 3% increase). Clearly the salary increase, itself, was not discriminatory (at least not as to Brown). Rather, Brown argues that after the salary increase, Brown "remained at the bottom of the pay scale when compared to similarly-educated, similarly-experienced, similarly-located non-black members of the P2 Group and of WMRC as a whole." Resp. at 14. As with Brown's race discrimination claim, then, his pay discrimination claim turns on whether similarly situated non-African-American employees were treated more favorably. And since Brown has identified no similarly situated non-African-American employees, as noted in connection with that claim, his disparate pay claim must fail for the same reason. Brown's concession that "all of the job descriptions were separate from [his]" and that he was the "only field person" with the paygrade title of technology evaluation specialist dooms his similarly situated argument. Brown Dep. 1 at 115:24–117:9.

Brown's argument that WMRC discriminated against him because it "refused to pay Brown at a rate similar to non-black chemical engineers," Resp. at 11, falls flat; Brown admits that he was not employed as a chemical engineer but rather as a manufacturing process engineer, the only manufacturing process engineer, in fact. *See* Resp. at 1. The comparison to the pay rate of chemical engineers—an entirely different type of engineer with a different job description— cannot serve as a similarly situated comparator to support Brown's pay discrimination claim. *See Adams v. Triton Coll.*, 35 F. App'x 256, 260 (7th Cir. 2002) ("[A]ll employees at the Level A administrator position—the position [plaintiff] held and the relevant comparison group—held separate, distinct positions with 'completely different responsibilities.' [Plaintiff] therefore

cannot establish that any other Level A administrator held a position substantially similar to her.").

The summary compensation chart Brown cites in support of his argument (included *supra* at 15) actually undermines it. The chart shows that, while a number of non-African-American P2 members earned more than Brown after the July 1, 2008 salary increase—Boyle (Caucasian), Jacobson (Caucasian), and Shipchandler (Indian)—Boyle and Jacobson held managerial positions at WMRC and Shipchandler was a professional engineer and certified energy manager (Brown was neither). *See* Brown Dep. 1 at 113:10–114:7; 115:3-7. Although Boyle, Jacobson, and Shipchandler earned more than Brown, they were not similarly situated to Brown. Additionally, the chart shows that Brown earned more than four Caucasian P2 members (Barnes, Marsch, Pickowitz, and Springman), two of whom had been at WMRC longer than Brown and one of whom had ten years more experience than Brown.

Brown has not introduced any evidence of similarly situated, non-African-American employees who were compensated more favorably.[27] Brown has failed to establish a prima facie case of pay discrimination and summary judgment is, therefore, granted to the University on the pay discrimination claim. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 590 (7th Cir. 2011) ("Absent a valid comparator, [plaintiff] cannot move past summary judgment under the indirect method of proof" on his pay discrimination claim.").

*       *       *

---

[27] Because Brown has failed to identify any comparators who were paid more favorably, it is not necessary to consider whether and to what extent any differential in Brown's pay was justified by the consistently lower performance ratings he received over the years of his employment with WMRC. As noted, Brown maintains that his performance ratings were regularly and discriminatorily downgraded, but he has not adduced evidence sufficient to support such a claim.

Because Brown has failed to provide evidence of specific facts creating a genuine, material, dispute on any of his claims, the University is entitled to judgment as a matter of law. As such, the University's motion for summary judgment is granted in its entirety and judgment will be entered in its favor.


Dated: November 5, 2015

John J. Tharp, Jr.
United States District Judge